1
2
3

**UNITED STATES DISTRICT COURT**

4

**DISTRICT OF NEVADA**

5
6

_____

7   JOSE R. LUNA,                          )
                                           )
8                     Plaintiff,           )
                                           )
9          vs.                             )                2:15-cv-01104-RCJ-NJK
                                           )
10  STATE FARM MUTUAL AUTOMOBILE           )                **ORDER**
    INSURANCE CO.,                         )
11                                         )
                      Defendant.           )
12  _____)

13          This case arises out of an insurer's alleged breach of an underinsured motorist policy.

14  Pending before the Court is a Motion to Reconsider (ECF No. 25).  The Court grants the motion.

15  **I.    FACTS AND PROCEDURAL HISTORY**

16          On or about October 13, 2011, Plaintiff Jose R. Luna was involved in an automobile

17  collision with a non-party in Las Vegas, Nevada, causing Plaintiff injury, pain, suffering, and

18  loss of earning capacity. (*See* Compl. ¶¶ 1, 7–12, ECF No. 1-1).  Plaintiff had incurred medical

19  expenses of $60,378.15 at the time he filed the Complaint and expected to incur more medical

20  expenses in the future. (*See id.* ¶ 16).  At the time of the collision, Plaintiff was insured by

21  Defendant State Farm Mutual Automobile Insurance Co. under Policy No. 047 2348-B07-28B

22  (the "Policy"). (*Id.* ¶ 14).  The Policy included an uninsured/underinsured motorist provision (the

23  "UIM Provision") for $25,000 per person and $50,000 per occurrence, but Defendant rejected

24

1   Plaintiff's demand to pay the $25,000 policy limits under the UIM Provision, offering only

2   $7,800. (*Id.* ¶¶ 15, 17–20).

3         Plaintiff sued Defendant in state court for: (1) breach of contract; (2) contractual breach

4   of the implied covenant of good faith and fair dealing; (3) tortious breach of the implied

5   covenant of good faith and fair dealing ("insurance bad faith"); (4) unfair claims practices under

6   Nevada Revised Statutes section ("NRS") 686A.310; (5) declaratory relief; and (6) punitive

7   damages.  Defendant removed and moved for summary judgment against all claims but the first.

8   The Court granted the motion as against the claims for contractual breach of the implied

9   covenant of good faith and fair dealing, unfair claims practices under NRS 686A.310(b), and

10  declaratory judgment.  The Court denied the motion as against the claims for insurance bad faith,

11  unfair claims practices under NRS 686A.310(e), and punitive damages.  The Court indicated that

12  it would be inclined to reconsider as against those claims if Defendant could provide unrebutted

13  evidence of its claim that Plaintiff's medical providers had forgiven the $41,097.86 of Plaintiff's

14  medical bills that worker's compensation did not cover, but Defendant had attached no such

15  evidence to the motion.  Defendant has now adduced such evidence via a motion to reconsider.

16  **II.    SUMMARY JUDGMENT STANDARDS**

17        A court must grant summary judgment when "the movant shows that there is no genuine

18  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

19  Civ. P. 56(a).  Material facts are those which may affect the outcome of the case. *See Anderson*

20  *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if

21  there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See*

22  *id.*  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported

23  claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

24

In determining summary judgment, a court uses a burden-shifting scheme.  The moving party must first satisfy its initial burden.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation and internal quotation marks omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  *See Celotex Corp.*, 477 U.S. at 323–24.

If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50. Notably, facts are only viewed in the light most favorable to the nonmoving party where there is a genuine dispute about those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007).  That is, even where the underlying claim contains a reasonableness test, where a party's evidence is so clearly contradicted by the record as a whole that no reasonable jury could believe it, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

## III.   ANALYSIS

### A.   Insurance Bad Faith

A violation of the covenant of good faith and fair dealing in the insurance context gives rise to a bad-faith tort claim. *Allstate Ins. Co. v. Miller*, 212 P.3d 318, 324 (Nev. 2009).  To establish a prima facie case of insurance bad faith, "the plaintiff must establish that the insurer had no reasonable basis for disputing coverage, and that the insurer knew or recklessly disregarded the fact that there was no reasonable basis for disputing coverage." *Powers v. United Servs. Auto. Ass'n*, 962 P.2d 596, 604 (Nev. 1998), *opinion modified on denial of reh'g*, 979 P.2d 1286 (1999).  No insurance bad faith claim lies where the insurer has a reasonable basis for challenging a claim. *See Allstate*, 212 P.3d at 324.  But summary judgment is not warranted on an insurance bad faith claim simply because the question of liability was "fairly debatable" at the time of the denial. *See Albert H. Wohlers & Co. v. Bartgis*, 969 P.2d 949, 956–57 (Nev. 1998) (citing *Sparks v. Republic Nat'l Life Ins. Co.*, 647 P.2d 1127, 1137 (Ariz. 1982)).  Summary

judgment is only appropriate where no reasonable jury could find from the evidence adduced that there was no reasonable basis to deny the claim.

In support of its previous motion, Defendant adduced evidence of the claim history in this case.[1]  Sometime prior to March 27, 2014, Plaintiff requested a certified copy of the Policy from Defendant. (*See* Huffman Letter, Mar. 27, 2014, ECF No. 18-4, at 15).  In its response, Defendant noted that a certified copy would be sent within a week but noted that any amount payable under the UIM Provision would be reduced by amounts already paid, that could have been paid, or that could be paid via worker's compensation laws, disability laws, or other similar laws. (*See id.*).  On October 23, 2014, Defendant made a settlement offer of $1,000. (*See* Korich Letter, ECF No. 18-4, at 17).  On January 28, 2015, Plaintiff made a $25,000 policy-limit demand. (*See* Nettles Letter, ECF No. 18-4, at 2).  The letter itemized Plaintiff's medical expenses and wage loss totaling $62,204.70 and noted that the third party's liability policy limit was $15,000. (*See id.*).[2]  In response, Defendant sent Plaintiff a letter noting that it had received no documentation for $1,399.57 allegedly paid or payable to Walgreen's Pharmacy or any documentation concerning lost wages. (*See* Huffman Letter, Feb. 2, 2015, ECF No. 18-4, at 11).  Defendant later made a settlement offer of $7,800. (*See* Huffman Letter, Mar. 24, 2015, ECF No. 18-4, at 12).

Defendant also adduced internal claim-processing documents indicating how it came to its calculations.  An Auto Injury Evaluation dated June 3, 2015 indicates past medical bills of

1 The parties do not appear to dispute coverage or the limits of the UIM Provision.

2 Although the letter is dated January 28, 2014, the letter states that the demand was supplemental to a demand made "in February of 2014" and notes that Defendant is entitled to offset the $15,000 paid or payable by the third party and the full amount of a yet undetermined worker's compensation lien. (*See id.* 3).  The date discrepancy is resolved by noting that the facsimile heading indicates a date of January 28, 2015.  The "2014" date of the letter in the heading is therefore likely a typographical error.

$60,378.15, past pain and suffering ranging from $15,061.69 to $21,000, and payments or offsets of $60,378.15 by "PIP/AB/MPC" and $7,261.69 by "Other Insurance," leaving a "Net Evaluation Range" of $7,800 to $13,738.31. (*See* Auto Injury Evaluation 4–5, ECF No. 18-4, at 6). Notes indicate $15,000 was paid by "OIC," as well as the following note for "W/C": "W/C [o]nly paid $19280.29, however our policy language states could have been paid, should have paid or would have been paid, therefore all medical specials of $58,864.58, should have been paid via W/C, so we take the full amount as an offset." (*Id.* 5). It also notes the previous offers of $1,000 and $7,800. (*See id.*).

Plaintiff complains that although the negligent party's insurance only paid $15,000 and worker's compensation only paid $19,280.29, Defendant credited itself $60,378.15 against Plaintiff's claim based on Defendant's interpretation of the UIM Provision, which provides for offset for worker's compensation benefits that "have already been paid . . . could have been paid . . . or could be paid." In *Phelps v. State Farm Mut. Auto. Ins. Co.*, 917 P.2d 944 (Nev. 1996), the Nevada Supreme Court approved a contractual offset against worker's compensation benefits to avoid a double recovery as not being against public policy. *See id.* at 947–48. The Court first noted that "the purposes of UM coverage are to make the claimant whole and to avoid double recovery . . . ." *Id.* at 947. The Court then noted that it had previously approved a contractual offset under a UIM provision for "sums paid or payable under any worker's compensation . . . ." *Id.* (quoting *Cont'l Cas. v. Riveras*, 814 P.2d 1015 (Nev. 1991)) (internal quotation marks omitted). The Court reasoned that even where an insured has paid premiums for his UIM coverage, it is not against public policy to permit a contractual offset so long as the offset functions only to avoid a double recovery and not to prevent the insured being made whole. *See id.* at 947–48 (citing *Ellison v. C.S.A.A.*, 797 P.2d 975, 978 (Nev. 1990); *Mid–Century Ins. Co. v. Daniel*, 705 P.2d 156 (Nev. 1985)). The Court approved the offset in *Phelps* because "there

[wa]s no possibility that enforcement of the offset provisions w[ould] deny Phelps a full recovery for his injuries because Phelps ha[d] already been made whole through a combination of payments." *Id.* at 948. The Court then reiterated that the purpose of UM/UIM coverage was to make an insured whole and that that contractual offsets were permitted to prevent double recovery. *See id.*

Defendant previously clarified in its reply brief that all of Plaintiff's medical bills were in fact paid. That is, although worker's compensation did not pay the full amounts the providers originally charged, that is because the difference was written down by the providers under a pre-existing agreement with worker's compensation. The Court noted that under such circumstances, the contractual exclusion should apply because the result is only to avoid a double recovery, not to avoid Plaintiff being made whole. Indeed, Defendant needn't even argue that the difference falls under the exclusion, because the difference represents an amount Plaintiff is not liable to pay. Unlike a case where a plaintiff seeks *damages* from a tortfeasor and is entitled to the full reasonable amount of damages caused regardless of any discounts in treatment under the collateral source doctrine, *see, e.g.*, *McConnell v. Wal-Mart Stores, Inc.*, 995 F. Supp. 2d 1164, 1169–73 (D. Nev. 2014) (Jones, J.), in the context of a contractual claim under an insurance policy, a plaintiff is entitled only to *contractual reimbursement* from the insurer. Unlike damages payable by a tortfeasor, contractual reimbursement payable by an insurer is measured not by the reasonable cost to remedy the harm but by the actual liability incurred by the insured. With contractual reimbursement, a court needn't adopt a collateral-source-type rule to avoid a windfall to a bad actor. To the contrary, a rule permitting a tort victim to recover written-down amounts not only from the tortfeasoror but also from the tort victim's own insurer under a UIM provision would shift a pure measure of tort damages from a tortfeasor to an innocent third party.

But Defendant previously adduced no evidence tending to show that the $41,097.86 of Plaintiff's medical bills that worker's compensation did not pay was in fact forgiven by Plaintiff's providers.  There therefore remained a genuine issue of material fact as to insurance bad faith, because it was possible there had been no write-down and that Defendant had refused to pay Plaintiff's entire claim knowing that it was liable to pay it.

Defendant now adduces evidence of the write-down.  The claims adjuster for Plaintiff's worker's compensation claim has attested that the original bills submitted from Plaintiff's providers as part of Plaintiff's worker's compensation claim totaled $62,805.03, that the bills were reduced to a total of $19,399.95 according to the worker's compensation carrier's fee agreements with Plaintiff's various providers, that this amount was paid, and that the claim has been closed. (Phillips Decl. ¶¶ 6–10, ECF No. 25-2).  The written down amount was $43,405.08. This evidence negates an essential element of the insurance bad faith claim, i.e., that Defendant had no reasonable basis for not offering more than $7,800.  Defendant has therefore satisfied its initial burden on summary judgment.

In response, Plaintiff argues that he continued to receive medical bills for ongoing treatment after his worker's compensation claim was closed in 2014.  The complaint in a separate interpleader action adduced by Plaintiff indicates that his attorney interpled the $15,000 paid by the at-fault driver's insurance company to the attorney, listing the rival claimants as the worker's compensation provider (for $21,167.70) and two later medical providers (for a total of ($1,027.09). (*See* Complaint for Interpleader, ECF No. 26-2).  The attorney himself claimed $6,551.14 in fees and costs. (*See id.*).  The case was settled, with the attorney receiving $7,261.69 and worker's compensation receiving $7,738.31. (*See* Stipulation and Order, ECF No. 26-3).  Defendant offered only $7,800, not the $15,061.69 to $21,000 at which Defendant itself valued the pain and suffering.  None of this, however, does anything to counter Defendant's

calculations as previously recounted in detail, *see supra*, or the evidence of the write-down submitted now, which Plaintiff appears not to dispute.  Defendant offered only $7,800 because the worker's compensation payment plus the written-down amount equaled the medical bills, and "other insurance" had additionally covered $7,261.69.  This represents the amount paid to Plaintiff's attorney out of the $15,000 provided by the at-fault party's insurance company in the separate interpleader action.  After the worker's compensation and attendant write-down had accounted for the medical bills claimed through June 3, 2015, the $7,261.69 payment brought the low-end estimate of the remaining claim (for pain and suffering) to $7,800.

The ultimate question is whether it could be found to have been bad faith for Defendant to have charged this amount against the $15,061.69 to $21,000 at which Defendant itself valued the remainder of the claim (the pain and suffering component of the claim) after the medical bills had been accounted for.  The Court finds that a reasonable jury could not find this to have been bad faith under the circumstances.  The $7,261.69 Defendant credited to itself against Plaintiff's claim represented a portion of the $15,000 Plaintiff had received from the at-fault party's insurer ("other insurance").  Plaintiff was reimbursed for that amount.  Plaintiff cannot complain of having voluntarily incurred this amount as attorney's fees.  Indeed, Plaintiff disclaimed any interest in this amount as against his attorney or anyone else. (*See* Stipulation and Order 2).  Plaintiff cannot argue in essence that Defendant acted in bad faith by failing to reimburse him for attorney's fees he incurred in litigation against the at-fault party.

Defendant therefore cannot be found to have acted in bad faith for offering only $7,800, which is the amount for which its liability can be argued to have become reasonably clear.  Plaintiff has not satisfied his shifted burden on summary judgment to show a genuine issue of material fact that Defendant had no reasonable basis to offer only $7,800.

///

**B.     NRS 686A.310**

Based on the lack of any evidence of write-offs, the Court previously denied the motion as to the claim under NRS 686A.310(e), which makes it illegal for an insurer to fail to effectuate a prompt, fair, and equitable settlement of Plaintiff's claim when Defendant's liability had become reasonably clear.  The Court now reconsiders and grants the motion.

**C.     Punitive Damages**

Because the sole remaining claim for breach of contract cannot support punitive damages, *see* Nev. Rev. Stat. § 42.005(1), the Court grants the motion as against the prayer for punitive damages, as well.

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion to Reconsider (ECF No. 25) is GRANTED.

IT IS FURTHER ORDERED that the Order (ECF No. 24) is AMENDED IN PART, and the Motion for Partial Summary Judgment (ECF No. 18) is GRANTED.

IT IS SO ORDERED.

Dated this 7th day of September, 2016.

_____
ROBERT C. JONES
United States District Judge